BROWN et al., Appellants, v. SOUTH JOPLIN LEAD & ZINC MINING COMPANY.

Division Two, March 6, 1906.

1. APPELLATE PRACTICE: Reviewing Evidence: Fraud and Deceit: New Trial. Where plaintiffs in an action for damages for fraud and deceit appeal from the action of the court in granting defendant a new trial, the appellate court will review the evidence only so far as seems necessary to determine the correctness of the ruling of the trial court in sustaining that motion.

2. FRAUD AND DECEIT: Misrepresentations: Opinion: Pay Ore: Location. Representations which are mere expressions of opinion cannot be made the basis of an action for fraud and deceit. So that where the owner of a mine represented that the drill hole showed fifty feet of pay ore, the fact that the ore, when mined, did not prove to be pay ore, does not entitle the lessee to recover for the money he has expended under his contract in attempting to mine the property.

3. ———: ———: ———: Location of Drifts. Likewise if the lessee had knowledge that the lessor's agent knew nothing by actual knowledge of the location of old drifts in the mine, but was only expressing an opinion as to their location, his representations as to the locations, even if untrue, are not actionable.

4. ———: ———: Reliance: Information From Others.    If the lessee, before the execution of the contract, made full inquiry from the lessor's former superintendent and other persons familiar with the mine and ascertained from them more accurate knowledge than was obtained from the lessor and his agents, and relied upon such information, he cannot recover for fraud and deceit.

Appeal from Jasper Circuit Court.—*Hon. Joseph D. Perkins*, Judge.

AFFIRMED.

*McAntire & Scott* and *Thomas & Hackney* for appellants.

(1) The court did not err in the admission of evidence, because all decisions upon all questions were properly decided. The court did not err in giving instruction 1. The instruction required the jury to find from the evidence not only that defendant made the false representations as to the drill hole, and its showings, but by the conjunction "and" the jury were further required to find that defendant had made false representations in relation to ground being solid, and not mined at points specified in the petition. These statements were all statements of facts. Defendant did not have opportunity of seeing ground below and judging for itself for the reason as shown by the evidence that the mines were full of water, and such statements were not opinions but statements of facts upon which plaintiff could and did rely. And defendant cannot now shelter itself behind the plea that its representations were mere expressions of opinion. Mudsill Min. Co. v. Watrons, 61 Fed. 163. Neither can the defendant officers shield themselves by saying now that they only told what they had heard from others. Fisher v. Mellan, 103 Mass. 503. (2) Where the pleadings made, as they did in this case, an issue as to whether any false representations were made, and whether if made they were relied

on by the defendant, if such issue is found for plaintiff, the court should not disturb the finding. Chapham v. Schillito, 6 Mor. M. Rep. 431; Chatham Furnace Co. v. Moffat, 16 Mor. M. Rep. 103; Chatham Furnace Co. v. Moffatt, 147 Mass. 403. Whether the statements made by Pain were averments of facts or mere opinion was a fact determined from the evidence by the jury, and the defendant is bound thereby. Banta v. Savage, 12 Nev. 151; Banta v. Savage, 7 Mor. M. Rep. 113. (3) In this case there was no error upon which to base the court's order granting a new trial, neither was there evidence upon which to base the same, and the case was such that no verdict in favor of defendant could have been permitted to stand, and under such circumstances, even though it was the first new trial given, the Supreme Court should set aside the order granting a new trial and permit the verdict to stand. Ottomeyer v. Pritchett, 178 Mo. 160; Udden v. O'Reilly, 180 Mo. 650; Markowitz v. Railroad, 186 Mo. 350.

*C. O. Tichenor, Meredith & Harwood,* and *Thomas Dolan* for respondent.

(1) The representations made by Pain, claimed by the plaintiffs to have been false and fraudulent, and upon which they recovered, were not statements of fact, but were mere expressions of opinion; being representations as to the character of mining lands and what they would produce, said representations pointing out by their very terms that they were made on information and belief, and the sources of such information; or, to use language of the Supreme Court of the United States in Southern Development Co. v. Silva, 125 U. S. 259, "where the purchaser undertakes to make investigations of his own, and the vendor does nothing to prevent the investigation from being as full as he chooses to make it, the purchaser cannot afterwards allege that the vendor made misrepresentations." Wilson v.

Jackson, 167 Mo. 135; Cornwall v. Real Estate Co., 150 Mo. 383; Harrison v. Walden, 89 Mo. App. 171; Tuck v. Downing, 76 Ill. 71; Gordon v. Butler, 105 U. S. 556; Weist v. Grant, 71 Pa. St. 95; Paretti v. Rebenack, 81 Mo. App. 494; 1 Bigelow on Frauds, 472, 490, 491. This doctrine is peculiarly applicable in cases of sales and leases of mines. Southern Development Co. v. Silva, 125 U. S. 259. (2) Where, in the sale or lease of lands, the means of knowledge are at hand and equally available to both parties, and the subject of the lease is alike open to their inspection, and the lessee does not avail himself of these means and opportunities to investigate the character of the property, he will not be heard to say that he has been deceived by the vendor's misrepresentations. The plaintiffs, having investigated this land for themselves, could not rely upon the investigations by Pain. Lewis v. Land Co., 124 Mo. 687; Green v. Worman, 83 Mo. App. 568; Lovelace v. Sutter, 93 Mo. App. 429; Crocker v. Manley, 165 Ill. 282; Farnsworth v. Duffner, 142 U. S. 43; Farrar v. Churchill, 135 U. S. 609; Sappiro v. Goldberg, 192 U. S. 232; Stratton's Independence v. Dines, 126 Fed. 968; 14 Am. and Eng. Ency. Law (2 Ed.), 102, 111, 112, 115; East v. Worthington Co., 88 Ala. 537; The 'N. & C. Co. v. Arnold, 49 N. Y. 390; Nounnan v. Land Co., 81 Cal. 1; Anderson v. McPike, 86 Mo. 300; Andrus v. Smelt. Co., 130 U. S. 647; Dunn v. White, 53 Mo. 186; Story's Equity Jurisprudence (12 Ed.), secs. 200 A, 201. (3) The plaintiffs, after they discovered the facts in connection with what they claimed were false and fraudulent representations on the part of Pain, did not repudiate the fraud, rescind the contract or claim their damage up to that time, but continued to operate under the lease and accumulate expenses, which they afterwards sued for and recovered; hence, the measure of damages which they had a right to recover, if any, was the damage suffered by them up to the time of the discovery of the alleged fraud. Hatcher v. Hatcher, 139 Mo. 626; Taylor v. Short, 107

Mo. 394; Lewis v. Land Co., 124 Mo. 687; Hayward v. Bank, 96 U. S. 618; 14 Am. and Eng. Ency. Law, 181. (4) The plaintiffs after a full knowledge of the truth or falsity of the representations made by Pain, confirmed and ratified the contract by making a new agreement, reducing the royalty and extending the option to purchase. Such an act on the part of the party claiming to have been defrauded amounts to a waiver of his right of action on the ground of fraud. 14 Am. and Eng. Ency. Law (2 Ed.), 171; Nounnan v. Land Co., 81 Cal. 1; Schmidt v. Messer, 116 Cal. 267; St. John v. Hendrickson, 81 Ind. 350; Cooley on Torts, 505; Doherty v. Bell, 55 Ind. 205. (5) This court has repeatedly held that it will not interfere with the discretion of the trial court in granting a new trial, however much it may disagree with that court upon its ruling, where there is any substantial evidence to support the finding, unless the case is such that no verdict in favor of the party to whom the new trial is granted would ever be allowed to stand; and such judgment of the lower court will be affirmed on the sole ground that the trial court had a right to exercise its discretion, and that this court will not interfere unless its discretion has clearly been abused. Fitzjohn v. Railroad, 183 Mo. 78; Havens v. Railroad, 155 Mo. 231; Hoepper v. Southern Hotel Co., 142 Mo. 387; Kuenzel v. Stevens, 155 Mo. 285; Grace v. Railroad, 156 Mo. 301; Graney v. Railroad, 157 Mo. 678; Coleman v. Cole, 158 Mo. 260; Roberts v. Tel. Co., 166 Mo. 385; Herndon v. Lewis, 175 Mo. 125; Emmons v. Quade, 176 Mo. 29; Ottomeyer v. Pritchett, 178 Mo. 165; Warner v. Railroad, 178 Mo. 129.

FOX, J.—This cause is here upon appeal by the plaintiff from an order of the Jasper Circuit Court sustaining, in behalf of respondent, a motion to set aside the verdict of the jury and granting a new trial.

This was an action brought by the plaintiffs

against the defendant for damages for fraud and deceit. The suit was brought on January 2, 1902. The plaintiffs alleged in their petition that on or about the ———— day of February, 1900, Henry B. Pain, a director and agent of the defendant in charge of its land in Jasper county, Missouri, and the defendant by its agent, the said Henry B. Pain, for the purpose of inducing plaintiff, C. J. Brown, and his associate, L. H. Pounds, to enter into the mining lease described in plaintiff's petition, falsely and fraudulently represented to them that it had drilled a hole in a shaft sunk on lot 9 to the depth of 186 feet and that there was a body of pay ore found therein fifty feet in depth, and that said pay ore was struck at a depth of 136 feet from the surface and continued rich in ore to the depth of 186 feet, and that the said defendant falsely represented to the plaintiffs that there were no old drifts within less than fifty or sixty feet on the east of said shaft, and none whatever on the north thereof, and that the ground thereunder was solid and had never been mined. The allegation is made that the plaintiffs relied upon the representations as true and believed them to be true and that they were thereby induced to and did sign the mining lease by which they obligated themselves to pump water, put in machinery, and sink the shaft on lot No. 9 to a depth sufficient to open up the lower run of ore, as shown by the drill, that is, to a depth of from 136 to 186 feet, and to plank the shaft and timber it as provided in said lease, and to do many other things as provided in said lease. That afterwards the plaintiffs, relying upon said representations as true and believing them to be true, and being deceived thereby, entered into said mining lots and expended and invested their money therein in the development of said lots and in sinking a shaft on lot No. 9, and placing machinery thereon and pumping water therefrom and running a drift from said shaft. That the said representations so made by defendant were

false, and known to be false, by the said defendant's agent when he made them, or that they were made as of his own knowledge, and that plaintiffs relied upon said representations as being true and were thereby induced to sign said lease; and that they sunk said shaft No. 9 and spent a large sum of money before they discovered the drift under said shaft and that said ground was not as represented.

.The answer consisted of a general denial.

The record discloses an immense volume of evidence introduced upon the trial of this cause. While in the brief of appellants we find the general statement that the evidence established the false representations made as charged in the petition, yet there is a failure to point out specifically the evidence of plaintiff or other witnesses in support of such allegations; hence we are left to an examination of the abstract of record to ascertain what, in fact, were the representations made to induce the plaintiff to enter into the contract of lease for this mining property.

The only question presented upon this appeal is the correctness or incorrectness of the action of the trial court in sustaining the motion for new trial. We shall not undertake to review the entire testimony in this cause; hence it is sufficient in order to dispose of the legal propositions involved to briefly indicate in this statement the testimony relating to the representations made.

J. M. Strickler, a witness for plaintiff, testified partly as follows: "Brown, myself and Pain went to the South Joplin Lead and Zinc Mining Company's ground, in the southwest part of the city, for the purpose of looking the ground over. Mr. Brown considered the question of taking a lease on the ground, and I went there and walked over all the ground and we questioned Pain as to the conditions. I asked particularly about where the old drifts were, as the water was up so we couldn't get into the ground, and told

him I didn't think Mr. Brown desired to take the lease without understanding what the ground was and whether there was solid ground where they had started the new shaft on lot 9. Mr. Pain walked all over the ground with Mr. Brown, myself and Mr. Miller. That was the first time I met Mr. Pain. We started on the west side of the ground, where they had started to put in a double-barrel pump, and he explained that shaft to us. We went over west where they were sinking a shaft that was then down about fifty feet, and I asked the question whether that shaft was in solid ground, and he said it was. He stepped to the east of it, and told us there were no old drifts on lot 9 near that shaft —within perhaps sixty feet. He stepped across to the corner of the mill, stating that the old drifts were over there, and that there were no drifts north of the shaft. He also stated that they had drilled this spot before they commenced the shaft and that there was pay ore from 136 to 186 feet, and part of it very rich. Those were the statements made.

"Q. Point out the point, as near as you can, whether Colonel Pain told you that it was solid ground form that place on to the shaft? A. The mill was on lot 10. He pointed out and designated the corner of the mill outside which was about sixty feet from this shaft. There was another shaft in here on lot 10. That drift run from this shaft and then continued to another shaft.

"Q. Did Pain tell you that he had been in the ground and knew the location of the drifts? A. I don't know that he spoke about being in the ground.

"Q. Did you ask him whether he had been in the ground? A. I don't think so.

"Q. Had you ever heard of drilling to demonstrate the quality of the ground before you came to Joplin? A. Yes, sir.

"Q. Ever have any drilling done? A. Yes, sir.

"Q.   You knew that a record of the drilling was kept?   A.   I knew sometimes it was kept.

"Q.   You knew the object of the drilling?   A.   Yes, sir.

"Q.   You get something out of the ground in any kind of drilling?   A.   Yes, sir.   This is sand pumped out.

"Q.   As a matter of fact, you knew in ordinary drilling some record was kept for the purpose of showing what the drill had gone through?   A.   Sure.

"Q.   You didn't ask him for a copy of the record? A.   Brown asked him for a copy of the record and he said he would get it.

"Q.   You were told this company had been mining there for a period of ten or twelve years on this ground?   A.   Yes, sir.

"Q.   You could see from the dump pile that there had been an enormous quantity of dirt taken out of that ground there?   A.   Yes, sir.

"Q.   You knew it was going to be an expensive proposition to pump the water?   A.   Yes, sir.

"Q.   You then went East and got your friend Pounds to go into this matter?   A.   Yes, sir.

"Q.   Told him that you had looked into it fully and that it was a good thing?   A.   Yes, sir.

"Q.   You told him you investigated the truth of the statement?   A.   I told him I investigated from this statement, and examined the ground and knew a good deal had been taken out and it was undoubtedly good ground.

"Q.   You told Pounds that you knew this ground? A.   I knew of the ground.   It had the reputation of being very good ground—had produced a good deal of ore.

"Q.   Where did you hear the reputation of the ground?   A.   Around Joplin.

194 Sup—44

"Q. Hear anyone else speak of it besides Pain? A. I spoke to Guyer, the ore buyer. He told me he bought more ore there than any other place around here.

"Q. Did you inquire about the ground around Joplin? A. I asked several men and they said if we could get solid ground it undoubtedly would produce a great deal of ore. We would have a good thing if we could get solid ground. I spoke to Morgan and to Guyer, the ore buyer, and several others.

"Q. Cox told you he had been working that ground a number of years? A. He spoke of the ground—that he had been there for sometime.

"Q. And told you he had been our foreman and superintendent? A. I think so.

"Q. And told you he had been mining the ground as a lessee for a year or two? A. I think he did.

"Q. Did you ask him any questions then about the condition of the ground, etc.? A. Yes, sir.

"Q. Did you ask Charley Cox anything about the ground and its condition? A. Yes, sir; I spoke about the ground and asked about the ground. He said it was very good ground and that they had cut drifts from the old shaft, pointing out the shaft marked down here over to the other shaft.

"Q. Did he tell you they run straight across or in a circle? A. They all said it run around in a circle, as it is marked there.

"Q. Did he tell you to what depth that had been cut? A. Yes, sir; that is, he said it raised from one shaft to the other. It was perhaps—my recollection is —in the neighborhood of 140 or 150 feet.

"Q. When you found out Cox had managed that ground for us there for three or four years as general superintendent and that after that he had mined it himself for a couple of years in his own account, you got all the information you could out of him about the ground? A. Yes, sir.

"Q. I want to know if you inquired of that man anything with reference to those drifts? A. Yes, sir.

"Q. You did ask him about that drift? A. Yes, sir.

"Q. You asked him all the questions that you could think of that were bearing upon the operations you were expecting to put through there? A. I asked Mr. Cox concerning the drift, what he left there and whether there was any ore. He said there was."

Plaintiff, C. J. Brown, testified partly as follows, upon the subject of representations:

"Q. Did you go out with him (meaning Pain) and Strickler to look over this property? A. Yes, sir; I looked it over with Pain a number of times before Strickler went. Strickler and I were related. He was manager of an interest in Galena in which I had been interested in another enterprise. We were looking for something of the kind. I was looking about the Joplin district. One day Colonel Pain told me of a nice plat of ground he had out there and by his invitation we looked it over a number of times and finally Strickler came from the East. He took me to his room and showed me the product of the forty for the last five years. It made a very fine showing.

"Q. He had an account of the ores sold from the forty? A. Yes, sir, for five years.

"Q. He showed you those? A. Yes, sir.

"Q. Do you recollect the circumstance of your going out with him and Strickler? A. Oh, yes. I called Strickler's attention to it as soon as he came back. The first opportunity we set to go out with Pain. Strickler was a man with more experience and could look it over, and I had simply talked with Pain. When Strickler came to look, he immediately suggested the question of what had been done in the ground. I had never discussed the matter of drifts. It hadn't occurred to me as so important, but Strickler said at once, 'The value of this lease will depend a good deal

on whether we are free from the other working, and whether we got this water all to pump, and whether the ground is solid.' And he and Colonel Pain discussed the question of drifts, and where they laid with reference to this shaft, and Colonel Pain marked out where he understood the nearest drift came to and the new shaft. That was under the corner of the mill, I think some 60 or 70 feet away. He said there was no drift nearer than that to the new shaft, and they purposely selected that place because it was solid ground.

"Q. What was said by Colonel Pain about the discovery made in the drill hole that the shaft was going down on? A. Well, he told me in his own words what the pencil copy of the drill hole afterwards showed. He said there was 50 feet of good pay ore there and the last 20 odd feet went through practically solid ore. The drill hole disclosed that, and from 56 to 86, as I remember, the drill disclosed a very rich bed of ore.

"Q. From 56 to 86? A. From 156 to 186 as I remember it.

"Q. Do you recollect that being repeated to Strickler? A. Oh, yes; certainly; it was talked a dozen times. We would meet Colonel Pain often on the street, and he was accustomed to coming out every day, of course.

"Q. I mean before you got to the deal, and before you agreed on the lease—the time Strickler states you and he and Pain went there, that you went out a couple of times, and that out there in your presence there, was there anything said by Mr. Pain about what was discovered in the drill hole? A. Yes, sir. Mr. Pain gave a very eloquent description of it—the whole business.

"Q. Now, was anything said about any work north —any cutting to the north—or was it simply that the nearest cutting was 60 feet? A. That question was specially raised by Strickler. He and Pain discussed about the drifts and we never talked about it. I didn't think about the importance of being away from that

ground, but Strickler and Pain especially discussed the location of the drifts.

"Q. I want to know what Pain said about the nearest drift that was to the shaft. A. The nearest that drift come—about under the corner of the old mill. That is about 60 feet away.

"Q. He made that statement? Did you hear anything said about how it was north of the shaft? A. Well, north, where that ore bed was—from that north —that was supposed to be solid ground from Pain's talk and everybody's talk."

On the part of the defendant there was testimony by witnesses tending to show substantially the following state of facts: That a Mr. Harwood told Brown that the only man in the company that knew anything about the ground was McClellan, and that Pain was a very sanguine man as to mining property, and that he had never been in the ground, and that the company would not be responsible for anything that Mr. Pain had said with reference to the ground. That Cox had been superintendent for a number of years and had done the last mining that had been done on the ground, and he could see Cox and find out anything he could from him. That McKee had made a survey of the ground, which survey was shown to Brown, and that Brown and Harwood took a lead pencil and tried to trace on the plat the large drift that is referred to in the evidence, and thus called Brown's attention to the location of this drift. At this interview between Harwood and Brown, the whole matter was gone over. That although the lease was possibly signed up before Strickler, the superintendent representing the plaintiffs, saw McClellan, before the lease was actually delivered and became effective, the date of the delivery being between May 29, 1900, and June 2, 1900, McClellan went over the ground with Strickler, and told him that his best information was from the mines and the plat by McKee, that the shaft was in the neighborhood

of thirty feet west of the west line of the old drift, and that the shaft on lot 9 was located at that point so as not to get too far away from the lower run of ore which had been developed at the bottom of the old drift. The plaintiffs employed Cox, the old superintendent of defendant, to assist them in sinking the shaft, and Cox testified that he told Strickler and Brown both about the location of the drifts in the ground, and about where they were: ''I gave them, as near as I could, knowing the ground as I did— I gave them a description and the location of the ground from memory, as near as I could.''

The lease as executed by the parties to this proceeding, contains this provision: ''That he [meaning the lessee] will forthwith sink a new shaft commenced on lot 9 to a depth sufficient to open up the lower run of ore, as shown by the drill, that is, at the depth of from 136 to 186 feet; the work of sinking and cribbing this shaft shall be done in the same substantial manner as the first fifty feet thereof, and all openings in this shaft shall be planked on both sides of openings with two 2-inch by 12-inch by 16-foot oak planks and then planked across on the top and the bottom of opening; the work on this shaft to be kept up continuously by as many men as can be advantageously employed therein; and no ore shall be cut from the upper runs of ore until after this shaft is completed.''

It also appears that under the terms of the original lease plaintiffs were obligated within one year from the date of the lease to purchase the plant at the appraised value agreed upon, or return the same in good condition; they were obligated to pay this defendant 25 per cent royalty; and there is testimony tending to show that on February 18, 1901, Brown and Strickler met the board of directors of this company, and obtained from the board a new proposition in reference to this matter, releasing them from their obligation to purchase the plant, reducing the royalty from 25 per

·cent to 20 per cent, and purchasing from defendant the machinery; and at this interview with this board of directors McClellan, Pain and Harwood all testified that no complaint was made by Brown and Strickler as to false representations and this testimony neither Brown nor Strickler contradicted.

At the close of the evidence the court instructed the jury and the cause was submitted. The jury returned a verdict finding the issues for the plaintiffs and assessed their damages at the sum of $14,400.42.

In due time and form defendant filed its motion for new trial, and on the 31st day of January, 1903, being the next regular term, said motion was by the ·court sustained, as evidenced by the following entry of record: ''Now comes on for hearing the motion for a new trial heretofore filed herein. By consent the motion is taken up and being seen, heard and fully understood by the court, the motion is sustained on the ·ground and for the reason that the court erred in admitting improper, illegal, incompetent and irrelevant ·evidence upon the part of the plaintiffs over the objections of the defendant and to injury of defendant. The court erred in giving instruction numbered 1 on behalf of plaintiffs; the court erred in ruling that the ·statement and allegation in plaintiffs' petition, to-wit, that there was a body of pay ore found herein (in the drill hole) 50 feet in depth, and that said pay ore was struck at the depth of 136 feet from the surface, and ·continued rich in ore to the depth of 186 feet, was a statement and representation of facts on which a recov·ery could be maintained. The court now being of the ·opinion that it is impossible for any person to know whether ore discovered by drilling a hole in the ground is pay ore or not. And that the above statements and ·allegation in the petition is not statement of fact on which a recovery can be had, but an expression of opinion on which the plaintiffs had no right to rely. That

the amount of damages found by the jury in their verdict is excessive.''

Plaintiffs herein filed their motion to set aside the order granting a new trial in this cause, which motion was by the court overruled and from the action of the court in granting a new trial and overruling the motion to set aside the same, plaintiffs prosecute this appeal, and the record is now before us for consideration.

### OPINION.

The record in this cause confronts us with but one proposition; that is, was the action of the trial court in setting aside the verdict of the jury and granting defendant a new trial, improper or erroneous, and did such action constitute such error as requires this court to reverse it with directions that the trial court enter judgment upon the verdict of the jury, as returned in the cause?

We shall not attempt to review all the evidence disclosed by the record, for if this cause is ever retried and again reaches this court it will be time enough to treat of the evidence applicable to that trial in which a final judgment has been rendered; hence, we must be content with disposing of the one proposition before us, that is, was the motion for new trial properly or improperly granted?

Instruction numbered 1 given in the trial of this cause, was complained of as error in the motion for new trial, and in the order granting a new trial one of the reasons assigned by the court for awarding it was predicated upon the error in giving this instruction. This instruction was as follows:

''The court instructs the jury that if they find from a preponderance or greater weight of the evidence, that on or about —— January or February, 1900, Henry B. Pain was agent of defendant and that the

defendant by its agent, the said Henry B. Pain, for
the purpose of inducing the plaintiffs, C. H. Brown, and
his associate, L. H. Pounds, to enter into the mining
lease read in evidence represented to said C. H. Brown
and J. M. Strickler falsely and fraudulently that it had
drilled a hole in a shaft sunk upon lot number nine to
a depth of 186 feet and that there was a body of pay
ore found thereon fifty feet in depth and that said pay
ore was struck at the depth of 136 feet from the surface
and continued rich in ore to the depth of 186 feet, and
that the said defendant, through its said agent, further
falsely represented to the plaintiffs that there were no
old drifts within less than fifty or sixty feet on the east
of said shaft and none whatever on the north of said
shaft, and that the ground thereunder was solid and had
never been mined, and if you further find from the evi-
dence that the plaintiff, C. H. Brown, relied on said
representations as being true, and believed the same
to be true, and was thereby induced to and did sign
the mining lease read in evidence, and that plaintiff,
L. H. Pounds, immediately after the execution of said
lease, on account of said representations, was induced
to, and did, take an assignment of said lease from said
Brown and assumed the one-half of the expense to be
incurred under said lease and that afterwards the said
plaintiffs relying upon said representations as being
true, and believing them to be true, and being deceived
thereby, entered into the possession of said mining lots
and expended and invested their money therein, in the
development of said lots and in sinking of said shaft
on lot 9, and placing mining machinery thereon, and
pumping water therefrom and running drifts from said
shaft, and if you further find from the preponderance
or greater weight of the evidence that said representa-
tions were false and known to be false by the said agent
of the defendant when he made the same, or if you find
that the said representations were made by the agent of
the defendant as of his own knowledge and that plain-

tiffs relied on the said representations as being true, the said representations would be fraudulent even though the said agent may not have known at the time whether they were true or false, and that said representations were made with intent to and did deceive the plaintiff, you will find the issues for the plaintiffs, and assess their damage at such sum as you may find the plaintiffs expended in sinking said shaft, driving said drifts, for pumps and pumping and other expenses reasonably necessary in complying with the terms and conditions of said lease up to the time when the plaintiffs discovered the falsity of said representations, that is, up to the time that they discovered that the ore in said drill hole was not as represented, if it was not as represented, and up to the time that the plaintiffs discovered that the representations as to the non-existence of drifts near said shaft on lot nine aforesaid were untrue, if they were untrue, less the value of the ores taken by plaintiffs from said lot while operating said lease, not to exceed the sum of fifteen thousand dollars.''

It will be observed in that instruction that it predicates one of the grounds of recovery upon the representation that the defendant had drilled a hole in shaft sunk upon lot No. 9 to a depth of 186 feet and that there was a body of pay ore found thereon fifty feet in depth and that said pay ore was found at the depth of 136 feet from the surface and continued rich in ore to the depth of 186 feet. In view of the evidence of the plaintiff Brown upon those representations charged in the petition, we are clearly of the opinion that this instruction was erroneous, and the trial court was fully warranted in granting a new trial on account of such misdirection to the jury. Mr. Brown, one of the plaintiffs in this case, positively testified that the defendant, through its agent, Mr. Pain, by reason of whose representations plaintiffs seek a recovery, told him exactly what the pencil copy of the drill hole afterwards

showed, and further stated that Mr. Pain had said to him that there was 50 feet of good pay ore, and that the last 20 odd feet went through practically solid ore, and Mr. Brown said in substance that the drill hole afterwards disclosed just what Mr. Pain had told him, and that from 156 to 186 feet the drill disclosed a very large bed of ore. Now it is manifest that those representations, at most, can only be treated as a representation of what the drill hole showed, for it will not be seriously contended that plaintiffs were relying upon a representation that this body of ore would be found to exist when the point was reached in sinking the shaft, for it is certain that he knew that the defendant or Mr. Pain, its agent, could not have possibly gone down into the ground before the shaft was sunk, and that Mr. Pain's representations must be confined as to what the drilling indicated. This being true and Mr. Brown stating positively what the drill hole disclosed, and that Mr. Pain had told him just what the pencil copy of the drill hole afterwards showed, takes that representation out of this case, and it was error for the court to embrace it in instruction numbered 1 given to the jury under the testimony in this cause.

That plaintiff Brown in this case understood such representation, not that it was an absolute fact that upon sinking the shaft the body of ore as stated in the representation in fact existed in the ground, but that the representation was in reference to what was disclosed by the indication of the drill hole, is emphasized by the contract of lease entered into by the plaintiff himself. The plaintiff Brown contracted to sink the new shaft commenced on lot 9 to a depth sufficient to operate the lower run of ore, not in accordance with any representations made by the defendant, *but as was shown by the drill,* that is, at the depth of from 136 to 186 feet. Here we have a full recognition by the contract itself that plaintiff Brown was proceeding to sink

this shaft for the purpose of reaching ore which was shown by the drill.

If a person owning land should represent that he had drilled the land and that the drilling disclosed that the drill hole went through so many feet of ore, which representations were false, and in fact the drilling disclosed that it went through no ore at all, and a party relying upon those representations, with no means at hand to determine their truth or falsity, should be induced thereby to enter into a contract, it might be said that such false representations would furnish a cause of action for rescinding the contract or for the recovery of damages, but a representation that he went through a body of pay ore, the mere fact that the representation was false in respect to the ore being pay ore, could not possibly furnish any cause of action. There is a wide difference of opinion among men as to when ore will pay, and when a person says that a body of ore through which a drill hole has been made is pay ore, it cannot be otherwise treated than as a mere expression of individual opinion that it will pay. The opinion as to its being pay ore is similar to a person looking at a field of agricultural land and saying that land will produce 40, 50 or 60 bushels of corn to the acre, which is nothing more than the expression of an opinion that it will so produce it; and the statement of such facts in the form of representations can never be made the basis of a ground of action for fraud or deceit, for the reason that the person to whom they are made will be presumed at least to regard such statements as a mere expression of opinion.

The law in this country is well settled as to the nature and character of false representations which can be made the basis of an action to vitiate a contract or to recover damages for fraud and deceit. In Wilson v. Jackson, 167 Mo. 1. c. 156, this court, in discussing representations made as to what land in Alabama was capable of producing, very clearly indicates the rule

upon this subject. It was there said: "These representations related to what the Alabama land was capable of producing, evidently a matter of opinion, and not shown by the evidence to have been unwarranted. The evidence does not show that it was represented that the land had produced, but that it could produce the articles mentioned in abundance. Representations of that character, even if unwarranted, are not misrepresentations of facts that would vitiate a contract." [Cornwall v. Real Estate Co., 150 Mo. 377.]

Mr. Bigelow on Fraud, vol. 1, p. 473, makes very clear the distinction to always be kept in mind between a representation which consists of matter of fact and those representations which are to simply be regarded as a mere matter of expression of opinion. He says: "The general proposition of law is that the representation must consist of matter of fact; and the word 'fact' is here used in distinction, *inter alia*, from opinion. Opinion then, generally speaking, does not constitute a legal representation. [Barnard v. Coffin, 138 Mass. 37.] . . . Opinion may be expressed in regard to facts incapable, as everybody knows, of clear knowledge. The nature of the center of the earth or of the moon, whether a vein of silver runs under a certain tract of land far away from any indications of the fact, the existence of an underground lake, the state of the weather a month hence—these are some of the many obvious examples." This same author further distinguishing between representations of a fact and a mere expression of opinion, says, at page 493: "A false and fraudulent statement, by the vendor, of the amount of hay cut from a farm the previous year has been held good ground for an action of deceit. It would doubtless be otherwise of representations of the amount of hay or wood to be cut on a farm."

In Gordon v. Butler, 105 U. S. 553, plaintiff sought to recover for an alleged fraud practiced on him in obtaining from him a loan of ten thousand dollars upon

insufficient security. The fraud of which the plaintiff complained was that the defendant had made a written estimate of the value of the security which contrained fraudulent exaggerations of the values made by two third parties. The property upon which the estimate of value had been made was a quarry. The court, in discussing that case, said: "To justify any imputation of fraud in giving the certificate, it was necessary to show that the parties signing it had knowledge, at the time, that the value of the property was materially less than their estimate. And from the nature of the property, and its imperfectly developed condition, such knowledge was impossible. No one could know its actual value until further development was made. Until then, any estimate must have been entirely speculative and conjectural. It would depend as much, perhaps, upon the temperament and expectations of the party making it, as upon any knowledge of facts. The law does not hold one responsible for the extravagant notions he may entertain of the value of property, dependent upon its future successful exploitation, or the result of future enterprises; nor for expressing them to one acquainted with its general character and condition. How could an over-estimate in such a case be shown? Other estimates would be equally conjectural. The law does not fasten responsibility upon one for expressions of opinion as to matters in their nature contingent and uncertain. Such opinions will probably be as variant as the individuals who give them utterance. A statement of an opinion assigning a certain value to property like a mine or a quarry not yet opened is not to be pronounced fraudulent because the property upon subsequent development may prove to be worthless; nor is it to be pronounced honest because the property may turn out of much higher value. The case of Holbrook v. Connor, which arose in the Supreme Court of Maine, illustrates this doctrine. There the vendor and his agent represented, among other things, that lands

sold by them contained large deposits of oil, and were of great value for the purpose of digging, boring for, and manufacturing it; and upon the representations the purchasers acted. The evidence tended to show that the representations were false and fraudulent, and the plaintiff obtained a verdict; but the Supreme Court set it aside. It appeared that the land had not been tested; and it was unknown to both parties whether it was valuable as oil land, except so far as might be inferred from the production of wells on neighboring lands, and a single well upon the land in question. The court held that under these circumstances the representation was to be regarded as a matter of opinion, and would not support the action. [60 Me. 578.]

"Whenever property of any kind depends for its value upon contingencies which may never occur, or developments which may never be made, opinion as to its value must necessarily be more or less of a speculative character; and no action will lie for its expression, however fallacious it may prove, or whatever the injury a reliance upon it may produce. The determination of its truth or falsity, until the contingency occurs or becomes impossible, would lead the courts into investigations for which they have no fixed rules to guide their own judgments or to instruct juries.

"For opinions upon matters capable of accurate estimation by application of mathematical rules or scientific principles, such, for example, as the capacity of boilers, or the strength of materials, the case may be different. So, also, for opinions of parties possessing special learning or knowledge upon the subject in respect to which their opinions are given, as of a mechanic upon the working of a machine he has seen in use, or of a lawyer upon the title of property which he has examined. Opinions upon such matters are capable of approximating to the truth, and for a false statement of them, where deception is designed, and injury has followed from reliance on them, an action may lie.

But to this class the present case does not belong. It falls within the first class mentioned.

"It follows from these views that the court below should have directed the jury, upon the close of the plaintiff's testimony, to find a verdict for the defendants; for, from the nature of the subject, in relation to which the certificate was given, the estimate of value was nothing more than a conjectural opinion, which, whether true or false, constituted no legal cause of complaint."

There are numerous other cases along this same line, all maintaining that a representation which is manifestly a mere expression of opinion can never be made the basis of an action for fraud and deceit or to rescind a contract, hence it is apparent that, so far as those representations relate to pay ore, they have absolutely nothing to do with this case and can form no basis for recovery.

The distinction must clearly be kept in mind between a representation that the land had been drilled and that the drilling disclosed at least some mineral, which representation was false, and that the drilling disclosed no mineral at all, which false representations induced the execution of the contract, and on the other hand representations which merely represented that the drilling disclosed pay ore, which subsequently developed was false, and that while there was some ore it was not pay ore. As heretofore indicated, in the former, the false representation, under certain circumstances, might be made the basis of a cause of action for fraud or deceit or to vitiate a contract, but in the latter, a representation as to pay ore must be treated as a mere expression of opinion. What one man might think was pay ore, another might not consider worth prospecting. As to whether or not it was pay ore would depend upon a number of conditions and circumstances; the state of the market, the price of labor and supplies, and numerous other things would have to be taken into

consideration in order to determine whether a body of ore was to be classed as pay ore or not, and any expression or representations that the land had been drilled and the drill hole extended through a large body of pay ore, cannot be treated otherwise than as a mere expression of opinion that the ore through which the drill hole extended was rich or pay ore. However, upon this proposition there is no necessity to pursue this subject further, for plaintiffs' own testimony establishes the fact that the representations of Mr. Pain in respect to the ore disclosed by the drill, were true, hence they cannot be made a basis of recovery in this cause.

The conclusion reached that instruction number 1 was erroneous and fully warranted the court in granting a new trial, renders it unnecessary to discuss the other two reasons assigned by the court as a basis for awarding the new trial. As indicated in the commencement of the discussion of this case, we will not undertake to review the evidence or the law applicable to it upon the other remaining propositions, as to the fraudulent representations in respect to the old drifts, nor as to the effect of the changing of the terms in the contract of lease on February 18, 1901. We cannot foreshadow what the evidence will be upon the retrial of this cause; we take it, however, that if the testimony shows that the plaintiffs knew that Pain, who was acting for the defendant, knew nothing by actual knowledge of the location of those old drifts, and was merely expressing an opinion as to where they were located, and making an estimate upon the ground or on the plat of the premises, the court will, as a matter of law, tell the jury that such statements and expression of opinions do not constitute any false representations. And again that the court will, if the facts disclosed upon the retrial of this cause are as indicated in the record now before us, that the plaintiff and Strickler, before the execution of this lease, made full inquiry of Cox who

194 Sup—45

had done a great deal of mining in connection with the old drifts spoken of, and other persons familiar with the ground, and ascertained from them more accurate knowledge than the defendant's agent, Pain, could possibly give them in respect to where the old drifts were located, and relied upon such information and by reason of Cox's experience employed him to superintend the sinking of the shaft on lot No. 9, give a similar declaration of law to the one above indicated.

The testimony in the record before us indicates that Mr. Strickler, who was examining this property for the plaintiff, and who had considerable knowledge of mining properties in that section of the State, made quite extensive inquiries in respect to this lot of ground and as to the drifts which might interfere with its successful operation, and if this lease was executed upon information secured by Strickler, and not by reason of any representations made by Pain as to the old drifts, then there can be no recovery.

We will not further discuss the questions presented by this record, for if this case is retried and again reaches this court new and additional testimony may be presented by the record, therefore we decline to further express an opinion upon this controversy.

The trial court was fully warranted in granting a new trial, and its action in doing so should be affirmed, and it is so ordered.

All concur.