EDWIN D. FISHER, Appellant, v. JOHN D. SEITZ, Respondent.

Kansas City Court of Appeals, May 19, 1913.

1. MINING STOCK: Vendor and Vendee: Treasury Stock. F bought 5000 shares of mining stock of S at 40 cents per share, and the latter indorsed it over to him, and he gave S a check for the price. He testified that he knew then that it was the individual stock of S. It was *held* that he could not maintain an action for fraud and deceit on the ground that S represented it was treasury stock.

2. ———: ———: ———: Fraud and Deceit: Measure of Damages. If a vendor sells mining stock to a vendee, fraudulently representing it to be treasury stock when in fact it is the vendor's individual stock, in an action for fraud and deceit the measure of damages would be the difference in value of the two stocks. If there is no proof of this difference, the vendee cannot recover.

3. ——————: ——————: ——————: Opinion: Bona Fides. Where in the sale of mining stock in a mine to be developed, a statement by the vendor to the vendee that it would prove equal to a certain named mine of great value, the vendee knowing its value was yet to be ascertained, such statement was so manifestly a statement of opinion as not to be debatable.

4. ——————: ——————: ——————: ——————: ——————: Warranty: Damages. Where a vendor of mining stock in a mine which gives evidence of ore, invests his own money in its development and in good faith believes it will prove to be a valuable mine, he may so state his opinion without becoming responsible, as upon a warranty, for the blasted hopes of the vendee. Nor is he liable for damages for fraud and deceit.

5. ——————: ——————: ——————: ——————: Friendship: Fiduciary Relation. Mere friendship, without fiduciary relation, between two business men, will not justify one in departing from the usual course of two individuals, dealing as antagonists, at arms length, in a transaction equally open to the investigation of both.

Appeal from Jackson Circuit Court.—*Hon. W. O. Thomas,* Judge.

AFFIRMED.

*John H. Lucas* and *Piatt & Marks* for appellant.

(1) This cause must be reversed for error of the trial court in permitting defendant to try and submit to the jury an issue wholly different from that made by the pleadings. Nauman v. Oberle, 90 Mo. 666; Davis v. Foreman, 229 Mo. 57; Bristol v. Braidwood, 28 Mich. 191; Judd v. Walker, 215 Mo. 324-30; Campbell v. Hoff, 129 Mo. 324; Adams v. Barber, 157 Mo. App. 395; Lindsay v. Gold Mines Co., 148 S. W. 849. (2) Representations as to the ownership or character of the stock sold plaintiff were with reference to a material fact, and plaintiff was entitled to have his money refunded upon discovery of their falsity. Tinker v. Skier, 195 Mo. 183; Hess v. Draffen, 99 Mo. App. 580; Davis v. Forman, 229 Mo. 27; Judd v. Walker, 215 Mo. 324-30; McLaren v. Cochran, 44 Mo.

255, 46 N. W. 408; Hansen v. Allen, 117 Wis. 61, 93
N. W. 805; Bristol v. Braidwood, 28 Mich. 191. (3)
The plaintiff was not upon an equal footing with de-
fendant and therefore not required to make inquiry,
but had a right to rely upon the representations made.
Bigelow on Fraud, sec. 534; Warnell v. Kemm, 57
Mo. 478; Cottrill v. Krum, 100 Mo. 404-5; Milan Bank
v. Richmond, 235 Mo. 543; Judd v. Walker, 215 Mo.
324-32; Stout v. Hardware Co., 131 Mo. App. 528;
Hess v. Draffen & Co., 99 Mo. App. 586; Brolaski v.
Carr, 127 Mo. App. 286; Richards v. Lee, Adm., 71
Mo. App. 230. (4) The refusal of the court to per-
mit plaintiff's testimony that he believed he was get-
ting treasury stock and that he was deceived was prej-
udicial error. 1 Wigmore on Evidence, sec. 581; Bige-
low on Torts (5 Ed.), chap. 1, sec. 6; Cooley on Torts
(2 Ed.), sec. 502, p. 587 and 8; Wann v. Scullin, 210
Mo. 486-7; note 9, par. (b), false representation, 23
L. R. A. (N. S.) 393; Hamlin v. Abell, 129 Mo. 203;
Snider v. McAtee, 165 Mo. App. 269; Davis v. For-
man, 229 Mo. 47; Cooley on Torts (2 Ed.), 580 and
581. (5) Whether said representations be regarded
as opinions or as facts when made for the purpose of
deceiving and believed and acted upon by plaintiff,
they constitute grounds for action for the deceit. 14
Am. & Eng. Ency. (2 Ed.), 35; Hamlin v. Abell, 120
Mo. 204; Brandt v. Frederick, 78 Wis. 1, 11 R. A. 199;
Bigelow on Torts (2 Ed.), chap. 1, sec. 3, p. 34; Cooley
on Torts (2 Ed.), sec. 497, p. 580; Story on Equity &
Jurisprudence, sec. 193. (6) The concealment by de-
fendant of material, existing facts known to him and
which he knew would prevent the sale to plaintiff if
known to him. Bank v. Crandall, 87 Mo. 211; Gott-
chalk v. Kircher, 109 Mo. 185-6. (7) Defendant was
promoting the enterprise and promoters are liable for
any concealments or misrepresentations made by them
in the sale of stock. The measure of damages or re-
covery in such cases is the price paid for the stock.

Goodwin v. Wilbur, 104 Ill. App. 45; McAleer v. Horsey, 35 Md. 439; 14 Am. & Eng. Ency. (2 Ed.), note 5. (8) Instructions one to six inclusive for defendant are illegal and erroneous. They expand the issues, they are inconsistent and contradictory. Brokerage Co. v. Gates, 190 Mo. 406; Adams v. Barber, 157 Mo. App. 395; Lindsay v. Goldmons Co., 148 S. W. 849; Bristol v. Braidwood, 28 Mich. 191; Wann v. Scullin, 210 Mo. 486-7. (9) Counsel for defendant was guilty of misconduct in going outside of the record and misstating the evidence in final argument, and the court erred in failing to sustain plaintiff's objection thereof. Haake v. Milling Co., 153 S. W. 74, A. S. No. 1; Stetzler v. Street Railway, 210 Mo. 704; Rose v. Kansas City, 125 Mo. App. 231; State v. Coleman, 136 Mo. 158; Neff v. City of Cameron, 213 Mo. 369; Torreyson v. Railroad, 144 Mo. App. 637; Eppstein v. Railroad, 179 Mo. 738; Haynes v. Trenton, 180 Mo. 133. (10) The court committed prejudicial error against plaintiff when ruling on objections by making oral comments on the evidence and on the evidential value thereof. In the presence of the jury. Rose v. K. C., 125 Mo. App. 231. (11) The verdict is against the evidence and the weight of evidence and so palpably so as to clearly establish passion, prejudice, misdirection or mistake on the part of the jury and must be set aside. Lehnick v. Street Railway, 118 Mo. App. 616; Spohn v. Railroad, 87 Mo. 84; Price v. Evans, 49 Mo. 396. (12) When the rulings of the court on admission of evidence are so indefinite and equivocal as to leave the jury in doubt as to what evidence had been admitted and what not admitted, a new trial should be had. Gardner v. Street Railway, 223 Mo. 412.

*L. C. Boyle* and *W. L. Stocking* for respondent.

(1) A promoter is one who brings together the persons who become interested in the enterprise, aids in procuring subscriptions and sets in motion the ma-

chinery which leads to the formation of the corporation itself. Every person acting by whatever name in the forming and establishing of a company at any period prior to the company. Cook on Stockholders, sec. 651; Dickerman v. Trust Co., 176 U. S. 203. (2) A mere false assertion of value where no warranty is intended is no ground of relief to a purchaser because such assertion is a mere matter of opinion which does not imply knowledge, and is a thing about which men differ. Mere expression of judgment or opinion does not amount to warranty. Brown v. Mining Co., 194 Mo. 681; Chase v. Rust, 90 Mo. App. 25; Anderson v. McPike, 86 Mo. 293.

ELLISON, P. J.—This is an action for two thousand dollars damages for fraud and deceit charged to have been practiced by defendant in selling mining stock to plaintiff of the par value of five thousand dollars. The judgment in the trial court was for the defendant.

It is charged in the petition that defendant owned $5000 in the stock of the Lodi Mines Company, which he knew was worthless and which he had purchased at a nominal price, and that he laid a plan or scheme whereby he might sell it to plaintiff, in the carrying out of which, and to induce plaintiff to buy, he called upon him and represented that he had invested a large sum of money of his own in the company and was personally attending to the development of the mine, and that it was as good as the "Lucky Tiger," a mine known to be of great value and in which both of them were stockholders, and that he had sold stock to a large number of plaintiff's friends. That though the market price was fifty cents per share, defendant could, as a special favor to him, get him some treasury stock at forty cents per share, giving him the benefit of ten per cent commission allowed by the company for sales, but that plaintiff would have to make his check for

$2500, the price at fifty cents, and he would give back his check for $500. It is then charged that plaintiff, believing such statements, gave his check for $2500 and received back defendant's check for $500 and five thousand shares of stock which he believed was treasury stock. That these statements and representations of defendant were false and fraudulent and known to be so when made and that they deceived plaintiff and induced him to make the purchase. It is then alleged that upon learning of the fraud and deception practiced upon him, he tendered back the stock and demanded a return of two thousand dollars, the money he paid therefor, and interest, and that defendant refused the stock and refused to return the money.

In 1907 two men, Joseph Eaton and C. I. Burt, became interested in the Lodi mine in the State of Nevada. Its capital stock was 3,000,000, shares of the par value of one dollar each. Of these, 2,400,000 had been issued and 600,000 remained in the treasury and was known as treasury stock. These men examined the mine with the aid and advice of an expert and agreed upon the purchase of 2,200,000 shares by an agreement which is not definitely disclosed by the record. The mine was located forty miles or more from a railway and no smelter was in reach. To develop it required the building of a road, the construction of waterworks and the construction of a smelter. These men then set to work to sell stock in order to finance this development. Eaton came to Kansas City, Missouri, and got two citizens to interest themselves sufficiently to invite several acquaintances into a conference with Eaton, looking to placing a part of the stock with them. Eaton's and Burt's faith was such that the former said to these people that he and Burt would advance the money for the smelter and take reimbursement out of the first income from the mine. Among the number of persons invited and attending were this defendant and Richard Gentry, and they were ap-

pointed, or at least agreed, to go out to Nevada and examine the property. Defendant had no particular knowledge or information about mines, though Gentry was considered an expert. Several of the party said they would subscribe for stock if the report to be made by these gentlemen was encouraging. Defendant was one of them and said he would take 25,000 shares at twenty cents a share, the price offered by Eaton to any who would subscribe. When defendant and Gentry examined the mine and saw much ore in sight on the fifth level the former was much encouraged and doubled his subscription, taking 50,000 shares, and paid for it $10,000, at the same time getting an option from Eaton for 200,000 additional shares at the same price—twenty cents. As showing that the appearances were rightly encouraging to defendant, it was disclosed that $35,000 worth of ore was taken out of that level on which he saw such encouraging outlook.

Others bought stock, and Eaton and Burt, individually, built a smelter at a cost of $60,000. But more development money was needed and treasury stock (the 600,000 shares above mentioned) was put on the market at fifty cents per share, and in a few months near 200,000 shares were sold at that price, some of it in Kansas City and some in Wichita—one man there after examining the mine bought for himself and father 70,000 shares at fifty cents.

But, without going any further into detail of the efforts with the mine, it will suffice to say that the apparent wealth of ore that was visible when defendant examined the mine, upon being worked became exhausted, or, as the miners say, "pinched out" or "ran out to a thread." Bonds were issued to a limited amount, and sufficient not being realized, finally a new company was organized, with this plaintiff as a stockholder and officer and stock issued to the amount of $400,000.

Fisher v. Seitz.

In order to get a full understanding as to the intentions of the defendant and the influences, proper or improper, used upon plaintiff to induce him to buy stock, it is well to notice that it was in 1908 that defendant doubled his subscription and took an option on 200,000 more shares at twenty cents; and that from January to August, 1909, 200,000 shares had been sold to different persons by Eaton at fifty cents; and that between these two dates, in March, 1909, the sale out of which this controversy has arisen was made to plaintiff—it being more than a year after defendant had bought the stock. In August following, the smelter had been erected and commenced to operate. Next year, in April, 1910, the effort at sale of bonds was made, and in September following was a meeting of stockholders concerning the finances of the company. In December, 1910, plans for a new company were started with plaintiff participating. In May, 1911, the new company acquired the old, and in February, 1912, the stock was increased from $125,000 to $400,000 with plaintiff's consent.

The foregoing statement of facts, practically undisputed in evidence, discloses that the mine which involved plaintiff's hopes and proved his disappointment, was not a myth with a paper existence only. It was a real affair with abundant internal evidence to justify the praise it received and the expectations it excited in the minds of those interested in it. This is a vitally important consideration, for as such it afforded ground for opinions which may have been expressed by defendant in his dealing with plaintiff. The very nature of mining property not yet developed, and with no pretense of a present output, with everything openly known to depend upon the unknown, with only opinions and hopes as the basis and the incentive to bargains, there is little left upon which to build, or to sustain, a charge of wilful fraud and deceit. The mine existed; the prospects were there and defendant's

faith was backed by large expenditures of his own money. If there had followed the smile of fortune instead of the frown of failure, no complaint would ever have escaped the plaintiff grounded on the assertion that he thought he was buying treasury stock belonging to the corporation and found out it was owned by defendant; or that he had learned defendant made a profit on the sale when he thought he was selling to him at cost.

If we concede that defendant stated to plaintiff that the property was the equal of the "Lucky Tiger," it would be so clearly an expression of opinion that a man of the least reason would know it was mere unknown statement.    Plaintiff and defendant were each stockholders in the Lucky Tiger mine. Its stock was worth seven hundred per cent premium, and it is preposterous to suppose that plaintiff took the statement as one of ascertained fact.

The pleader in this case seems to have had greater expectations as to evidence than was realized.    He charged that plaintiff obtained the stock at a "nominal price, which he knew was worthless and of no value and knowing it planned to induce and did induce plaintiff to buy."    There was a total failure of proof of such allegation; on the contrary, the evidence conclusively disproves it.

In fact, the circumstances considered, there is very little difference between the parties in the evidence, at least as to matters of substance.    For instance, much is made over the assertion that plaintiff thought he was buying treasury stock when it turned out to be defendant's individual property.    Yet,    in answer to repeated questions, he could not be got to say the defendant told him it was treasury stock. Besides, it was in defendant's name and was indorsed over to plaintiff, and he admitted that when he drew his check payable to defendant he knew it was the latter's property, and he made no objection.    As an ex-

cuse for not saying anything of what, on the theory now presented, should have been a startling discovery by him, he stated that he thought "it was the way they had to handle it."

It is a part of plaintiff's claim that defendant, in order to make the sale to him at forty cents, represented that the market price of the stock was fifty cents, and that it was the desire of the company and of all parties interested not to break that price by a sale at a less figure, and that as the company was allowing ten per cent commission for sales he desired a check from plaintiff for $2500, the amount which would be due at fifty cents, and he would then give plaintiff his check for $500, representing the commission. And that was agreed to; but what it makes out in the way of advancing plaintiff's charges of fraud and deceit, we do not see. It was the truth, the stock was selling at fifty cents and that a ten per cent commission was allowed for its sale; and it being a fact, plaintiff readily carried out his part of the suggestion and completed the purchase in that way.

Again, plaintiff claims that defendant represented that he was selling to him at the same price he had paid for it, whereas he had paid only twenty cents per share and sold to him at forty cents. But plaintiff, realizing that the mere statement of a vendor of what an article cost him would not ordinarily be regarded as matter on which a vendee should rely, or as fraud or deception in law, alleged in his petition that he and defendant bore such close and intimate acquaintance and friendship, each to the other, and had so many business transactions together, that plaintiff "fully trusted and believed all his statements and relied absolutely upon all representations made by him, all of which defendant well knew." Passing by any question whether acquaintance and friendship between vendor and vendee destroys the rule of *caveat emptor*, and the necessity between sane adults of understand-

ing that they are dealing at arm's length, it is sufficient to say that the testimony of plaintiff himself contradicts the pleading. He testified that he knew defendant, but admitted they had never had a business transaction prior to this one, and that they had no social relationship, and had never exchanged a visit, either at home or in their respective places of business. But even these allegations in the petition furnish no right to plaintiff to complain as to deception regarding the cost price, for it is nowhere stated in the pleading that defendant made any representation whatever as to what he had paid for the stock. Though as to this, it may be that defendant by not objecting to evidence in that respect, elected to treat it as pleaded.

Of the general law bearing on the case, there cannot be two views. It is not so stated by him, but plaintiff's position is, in effect, a contention that defendant warranted large and profitable results to him. We think there is no basis for such theory. On the case generally there is cited Davis v. Forman, 229 Mo. 27, and other authority marshalled by the industry of plaintiff's counsel, which contain sound statements of the general law, but the facts appearing therein are so foreign to those appearing in this case that they have no application. We think more applicable authority is found in Anderson v. McPipe, 86 Mo. 293; Brown v. Lead & Zinc Company, 194 Mo. 681, and Chase v. Rusk, 90 Mo. App. 25.

But, if plaintiff had otherwise made out a case, he would necessarily fail to obtain a judgment for the reason that his action is a claim for damages and he has not proved any. The action is not for a rescission of the contract, but for two thousand dollars in damages. How was he damaged? He bought stock at forty cents that at the time, and afterwards, was selling for more than that price. The stock was in a real mine with alluring prospects in the opinion of conservative men. Large quantities of ore were taken out. The

management were not adventurers, out seeking to dupe the unwary, for they prosecuted the enterprise and expended large sums of their individual money, and plaintiff himself as stockholder and officer of the successor company joined in the issue of $400,000 in stock, long after the appearances which so captivated defendant and others had disappeared. As to the defendant, it may be repeated that there is not the slightest ground upon which to base a statement that he knew the mine was worthless. He put large sums of his own money in it and we may add what has not been stated, he sold to his brother a larger amount of stock than he did to plaintiff.

Plaintiff is thus left to fall back upon the statement dwelt upon in argument that defendant sold him his individual stock instead of the treasury stock. Passing by the fact to which we have already referred, that, in reality, he knew he was getting individual stock when he paid for it, we ask, wherein was he damaged? Wherein was the treasury stock any more valuable than individual stock? Standing this branch of the case to itself, if plaintiff was to get treasury stock and did get individual stock, his damage would be represented by the difference in the value of the two. But he made no showing of such damages. On the contrary it appears in evidence in defendant's behalf that if plaintiff's money had been paid into the treasury for the development of the mine, the result would have been exactly as it is. On this general subject, see: Thompson v. Newell, 118 Mo. App. 405; Beam Co. v. Bakewell, 224 Mo. 203, 222.

In our view the defendant's demurrer to the evidence should have been sustained. But since the case was submitted to the jury by the trial court, we need not put our decision on that ground. We think no error was committed in instructions except it be that plaintiff's were far too liberal. His instruction No. 3 was practically embraced in No. 1, and there was no

error in refusing it. No. 4 was argumentative and unnecessary. In addition to this, it, practically speaking, classified all this stock and all other, as worthless unless they were "sold in the ordinary usual way and manner in which stocks and bonds are sold."

We find no objection to the instructions for defendant. The last one, withdrawing from the consideration of the jury what was said as to the Lucky Tiger mine, was but an application of the law as to the expression of opinion. That such expression was understood by both parties as a mere belief in the unknown future of the Lodi mine is too apparent for controversy. There is no substantial objection to the court's rulings on the evidence. The judgment being manifestly for the right party, is affirmed. All concur.